

FILED

May 31 2018, 8:44 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Renee M. Ortega
Lake County Juvenile Public Defender's
Office
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of:  Ad.M., An.M., and S.M. (Minor Children); <br><br> A.M. (Mother), <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Petitioner.* | May 31, 2018 <br><br> Court of Appeals Case No. 45A04-1711-JC-2634 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable Thomas P. Stefaniak, Jr., Judge <br><br> The Honorable Jeffrey Miller, Magistrate <br><br> Trial Court Cause Nos. 45D06-1706-JC-722 45D06-1706-JC-723 45D06-1706-JC-724 |

**Najam, Judge.**

## Statement of the Case

A.M. ("Mother") appeals the trial court's adjudication of her three minor children, Ad.M., An.M, and S.M. ("Children"), as children in need of services ("CHINS"). Mother raises a single issue for our review, which we restate as whether the trial court erred when it adjudicated Children to be CHINS.[1]

We reverse.

## Facts and Procedural History

Mother is married to P.G. ("Father"). Mother and Father have one child, S.M., born October 27, 2015. Mother also has two children from a prior relationship: Ad.M., born December 19, 2005, and An.M., born February 24, 2014. When S.M. was born, she tested positive for marijuana. As a result, the Indiana Department of Child Services ("DCS") began an informal adjustment[2] with Mother, which she successfully completed in 2016.

Mother owns a trailer on Melton Road in Gary. However, in 2017, Mother and the Children were staying in a house on Whitcomb Road because the power had been shut off at the trailer. The house belonged to a family friend named B.V. Father did not reside at the house with Mother. On June 22, 2017, Mother and Father got into a physical altercation at the house while the

---

[1] The Children's respective fathers do not participate in this appeal.

[2] An informal adjustment is "a six[-]month probationary period with DCS in which the family will participate in services and . . . upon successful completion, then they are done." Tr. Vol. II at 20.

Children were present. Mother and Father believed that the Children were asleep. However, Ad.M. was awake and walked in on the altercation. Ad.M. saw that Father was holding Mother down. Ad.M. attempted to break up the fight, but Father shoved Ad.M. Ad.M. got scared, and he called the police. Officers arrived at the home and conducted an investigation. During their investigation, officers found six marijuana plants that B.V. admitted belonged to him. Officers arrested B.V.

[5] DCS received a report that there had been a domestic dispute at the house while the Children were present and that there were drugs in the house. DCS investigator Erin Kujawa was assigned to investigate the report. On Friday, June 23, Kujawa attempted to find Mother, but Mother was not at either the house or the trailer. Kujawa was finally able to reach Mother by telephone, and they set up an initial meeting for Monday, June 26. During that weekend, Mother and the Children moved their belongings from the trailer into the house.

[6] On June 26, Kujawa met Mother at the house. Kuajwa noticed that the house was "cluttered." Tr. Vol. II at 25. During the meeting, Kujawa spoke with Mother about the marijuana plants that officers had found, and she learned that Mother knew that the plants had been there. Kujawa also noticed that Ad.M. had a bruise on his face. Mother stated that Ad.M. was bruised when he tripped over An.M.'s foot while at the doctor's office. Kujawa asked Mother to take a drug test, but mother refused.

[7] On June 29, Janet Taylor, a permanency case manager with DCS, visited Mother at the house. Taylor observed that the house was in "terrible condition." *Id*. at 34. She noticed that the water from a bathroom sink was brown, the kitchen faucet did not work, there was a "minimal amount of food," and the carpet was "extremely dirty. It felt sticky under your feet." *Id*. at 36. She also saw that S.M.'s bed was right in front of a television. Taylor thought that that was dangerous because S.M. could "easily pull the television down on herself." *Id*. at 35. An.M. and Ad.M. slept on air mattresses on the floor, but the air mattresses were not blown up. Taylor also noticed that the toilet was not operable and there was a "very bad odor" coming from the toilet. *Id*. at 37. Taylor observed that there was no water in the home, and there was very little food. Mother told Taylor that she went to the store daily to buy food and water, but there was no drinking water at the time of Taylor's visit.

[8] Based on her observations, Taylor told Mother that the house was not suitable for children. Mother called Father and arranged for her and the Children to stay with Father at Father's mother's home. Taylor visited that home and found it to be appropriate. As such, Mother and the Children moved into Father's mother's home with Father.

[9] That same day, DCS filed petitions alleging that the Children were CHINS due to the incident of domestic violence, the conditions of B.V.'s house, Mother's unstable housing, Mother's refusal to take a drug test, and the presence of drugs in B.V.'s house. The Children remained in Mother's care.

[10] The next day, Taylor again visited the family to put a safety plan into place due to the incident of domestic violence. When Taylor mentioned the safety plan, Mother "cursed [her] out." *Id*. at 40. Taylor told Mother about community resources that were available to Mother, including food stamps and WIC, but Mother said they "didn't need those things" because Mother is an attorney. *Id*.

[11] About one week later, Mother called Taylor to inform Taylor that Mother and the Children had moved out of Father's mother's home, were currently staying at a hotel, and were going to move back into the trailer. The next day, which was a Friday, Taylor went to the trailer and observed that it was "extremely cluttered." *Id*. at 43. Taylor informed Mother that she would return on Monday and that if the house was not clean, then the Children could not stay there. When Taylor returned to the trailer on Monday, it was clean. Also during her investigation, Taylor spoke with the Children and learned that the Children had "seen [marijuana] in the home[.]"[3] *Id*. at 60. And, at some point, Mother filed for a protective order against Father.

[12] B.V. was also present at the trailer when Taylor arrived on that Monday. Taylor learned that B.V. watches the Children for Mother when Mother is at work. Because officers had arrested B.V. and because B.V. had admitted to using marijuana, Taylor requested that B.V. submit to a background check.

---

[3] It is unclear from the record when Taylor interviewed the Children or in which home the Children had seen the marijuana. Construing the record in the light most favorable to the trial court's judgment, as we must, we conclude that this sentence must refer to Mother's home at the time of the evidentiary hearing on the CHINS petition.

B.V. failed to comply. About ten days after her inspection of the trailer, Taylor obtained a hair follicle from Mother in order to run a drug test. Mother tested positive for marijuana.[4] Taylor also tested Mother for drugs a second time about a month later, on August 15, and Mother again tested positive for marijuana.

[13] On August 31, the trial court held a hearing on the CHINS petition. During the hearing, the court authorized the following services for Mother: clinical assessment, home-based case work services, parenting assessment, domestic violence services, substance-abuse assessment, and hair follicle testing. The trial court then held a fact-finding hearing on October 24. Thereafter, the trial court adjudicated the Children to be CHINS. This appeal ensued.

## Discussion and Decision

[14] Mother contends that DCS failed to present sufficient evidence to demonstrate that the Children are CHINS. Our Supreme Court has set out our standard of review.

> A CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *[N.L. v. Ind. Dep't. of Child Servs. (In re N.E.)]*, 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence

---

[4] Mother also tested positive for amphetamines. However, Mother has a prescription for Adderall.

that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* We reverse only upon a showing that the decision of the trial court was clearly erroneous. *Id.*

*S.S. v. Ind. Dep't. of Child Servs. (In re K.D.)*, 962 N.E.2d 1249, 1253 (Ind. 2012). The court did not enter specific findings of fact, and neither party requested them. As such, we review the issues under "the general judgment standard, under which a judgment 'will be affirmed if it can be sustained on any legal theory supported by the evidence.'" *J.B. v. Ind. Dep't. of Child Servs. (In re S.D.)*, 2 N.E.3d 1283, 1287 (Ind. 2014) (quoting *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997)).

[15] DCS alleged that the Children were CHINS pursuant to Indiana Code Section 31-34-1-1, which provides that a child is a child in need of services if, before the child becomes eighteen years of age: (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and (2) the child needs care, treatment, or rehabilitation that: (A) the child is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[16] Our Supreme Court has interpreted that statute to require "three basic elements: that the parent's actions or inactions have *seriously endangered the child*, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287

(emphasis added). "A CHINS adjudication focuses on the condition of the child." *In re N.E.*, 919 N.E.2d at 105. And, when determining whether a child is a CHINS under Section 31-34-1-1, the juvenile court "should consider the family's condition not just when the case was filed, but also when it is heard." *In re S.D.*, 2 N.E.3d at 1290.

[17] Here, Mother contends that the trial court erred when it adjudicated the Children to be CHINS because there is insufficient evidence that Children were seriously endangered by Mother's actions or inactions.[5] We must agree.

[18] On appeal, DCS first contends that the Children are CHINS because of Mother's marijuana use and the presence of marijuana in Mother's home. In support of that contention, DCS presented evidence that Mother had tested positive for marijuana on two separate occasions after DCS had filed the CHINS petitions, and Taylor testified that Mother is a "chronic" user. Tr. Vol. II at 47. In addition, Taylor testified that the Children had told her that they had seen marijuana in the home.[6]

[19] We must conclude that evidence of one parent's use of marijuana and evidence that marijuana has been found in the family home, without more, does not

---

[5] During the fact-finding hearing, DCS presented evidence regarding Mother's housing situation. However, on appeal, DCS does not allege that the Children are CHINS because of Mother's living arrangements. And the evidence presented shows that, while Mother moved several times in a matter of only a few weeks, she now resides with the Children at the trailer, the trailer was in "decent order" when Taylor visited on October 6, and Mother still resided there at the time of the fact-finding hearing. Tr. Vol. II at 54. Additionally, during the dispositional hearing, the trial court found that Mother's housing is "fine." *Id*. at 85.

[6] DCS did not present specific evidence of when or how often the Children had seen marijuana in the home.

demonstrate that a child has been seriously endangered for purposes of Indiana Code Section 31-34-1-1. Indeed, DCS did not present any evidence that either Mother's drug use or the presence of marijuana in the home have seriously endangered the Children. Rather, when asked to describe how Mother's marijuana use has impacted the Children, Taylor testified that she "really can't see the way that it has impacted them." *Id*. at 56. Further, DCS did not present any evidence that Mother used drugs while the Children were present in the home or while she had care of the Children.

[20] This court has held that children were not CHINS despite Mother's history of sporadic marijuana use because there was no evidence that, at any point and time, any of the children were endangered, that the parents had ever used drugs in the presence of the children, or that there was ever an occasion in which the parents were impaired by substance abuse while the children were in their care. *See A.M. v. Ind. Dep't. of Child Servs. (In re S.M.),* 45 N.E.3d 1252, 1255-56 (Ind. Ct. App. 2015).

[21] Again, it is well-settled that a "CHINS adjudication focuses on the condition of the child." *In re N.E.*, 919 N.E.2d at 105. And this court has also held that a mother's ingestion of marijuana while pregnant and the presence of marijuana in the meconium of the child at birth is not sufficient evidence in itself to demonstrate that a child is seriously impaired or seriously endangered. *See In re S.M.*, 45 N.E.3d at 1255-56. Following *In re S.M.*, without any specific evidence that the marijuana itself or Mother's use of it presented a serious

danger to the Children, we must conclude that the DCS failed to present sufficient evidence to support the CHINS determination.[7]

[22] Still, DCS also alleged that the Children were CHINS because of the single incident of domestic violence between Mother and Father, which Ad.M. had witnessed. Specifically, DCS asserts that the Children are CHINS because Mother moved in with Father approximately one week after the incident, Mother has not filed for a dissolution of her marriage to Father, Mother did not file for the protective order right away, Ad.M. had expressed concerns to Taylor about the domestic violence, and Mother has not received counseling or taken Ad.M. to be evaluated by a therapist. To support its contention, DCS relies on *In re N.E.*, 919 N.E.2d at 106, in which the Indiana Supreme Court determined that the "ongoing domestic violence between [mother] and the alleged father of her youngest child" and the "several incidents of domestic violence against Mother in the presence of her children" supported the CHINS adjudication.

[23] However, the domestic violence here was neither "ongoing" nor over "several incidents," and we have held that a child is not a CHINS after witnessing a domestic-violence incident when the mother quit seeing her abuser and had filed for a protective order against him. *See M.C. v. Marion Cty. Dep't. of Child*

---

[7] To the extent that DCS alleged at the fact-finding hearing that the Children are CHINS because B.V., the primary caretaker of the Children when Mother is at work, was arrested for possession of marijuana and has admitted to a history of using marijuana but has failed to submit to a background check, DCS similarly presented no evidence that B.V. had ever used marijuana while the Children were in his care or in the presence of the Children. Further, DCS did not present any evidence that B.V. has watched the Children at his house since Mother and the Children moved out.

*Servs. (In re B.N.)*, 969 N.E.2d 1021, 1026 (Ind. Ct. App. 2012). Similarly, the evidence in the instant case demonstrates that there was one incident of domestic violence between Mother and Father, that Mother and the Children have since moved away from Father, and that Mother has filed for a protective order against him. Accordingly, DCS has not presented sufficient evidence to show that the single incident of domestic violence seriously endangered the Children.

[24] Where the termination of parental rights is at stake, the trial court has "discretion to weigh a parent's prior history *more heavily* than efforts made only shortly before termination." *E.M. v. Ind. Dep't. of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014) (emphasis added). However, when determining whether a Child is a CHINS under Section 31-34-1-1, as is the case here, courts "'should consider the family's condition not just when the case was filed, but also when it is heard.'" *Gr. J. v. Ind. Dep't. of Child Servs. (In re D.J.)*, 68 N.E.3d 574, 580 (Ind. 2017) (quoting *In re S.D.* at 1290 (citation omitted)). "Doing so avoids punishing parents for past mistakes when they have already corrected them." *Id.* at 581. Thus, in a CHINS case, we give special consideration to a family's current conditions.

[25] Here, while the facts indicate that there were problems with Mother's living arrangements and with domestic violence at the time DCS filed the CHINS petition, the facts also demonstrate that Mother has remedied the housing situation, and she has moved away from Father and filed for a protective order against him. And even though the Children have seen marijuana and Mother

continues to use marijuana, DCS presented no evidence that either the Children's observation of the marijuana or Mother's use of it has endangered the Children or impacted them in any way. In sum, DCS did not meet its burden to demonstrate that the Mother's actions or inactions have impacted, much less seriously endangered, the Children. *See In re S.D.*, 2 N.E.3d at 1287.

[26] We acknowledge that the "CHINS statutes do not require the juvenile court and DCS to wait until a child is physically or emotionally harmed to intervene[.]" Appellee's Br. at 18. But the CHINS finding must be based on facts. And it was DCS's burden to prove that Mother's actions or inactions have seriously endangered the Children. *See In re N.E.*, 919 N.E.2d at 105. Here, DCS did not present any evidence that the Children's physical or mental conditions were seriously impaired or endangered as a result of Mother's actions or inactions. *See In re B.N.*, 969 N.E.2d at 1026. We therefore hold that the trial court erred when it found the Children to be CHINS, and we reverse the trial court's judgment.

[27] Reversed.

Robb, J., and Altice, J., concur.