

**FILED**

Sep 27 2018, 8:05 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Leanna Weissmann<br>Lawrenceburg, Indiana | Curtis T. Hill, Jr.<br>Attorney General of Indiana<br><br>Frances Barrow<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Matter of B.V., Minor Child, and D.V., Mother,<br><br>*Appellant-Respondent*,<br><br>v.<br><br>The Indiana Department of Child Services,<br><br>*Appellee-Petitioner*. | September 27, 2018<br><br>Court of Appeals Case No. 18A-JC-988<br><br>Appeal from the Decatur Circuit Court<br><br>The Honorable Timothy B. Day, Judge<br><br>Trial Court Cause No. 16C01-1711-JC-451 |

**Brown, Judge.**

[1]     D.V. ("Mother") appeals the trial court's order determining that B.V. is a child in need of services ("CHINS"). Mother raises one issue which we revise and restate as whether the evidence is sufficient to support the court's determination that B.V. is a CHINS. We reverse.

### Facts and Procedural History

[2]     On November 10, 2017, Mother gave birth to B.V. That month, the Department of Child Services ("DCS") filed a petition alleging that B.V. was a CHINS. The petition also alleged that both Mother and B.V. tested positive for THC, staff at the hospital reported concerns for Mother's mental health, Mother admitted to being diagnosed with bipolar disorder and not taking medication for treatment, and Mother was living with a known drug user.

[3]     On November 15, 2017, the court held a hearing at which Mother denied the allegations and asserted that she never yelled at her baby and that she was diagnosed with a mood swing disorder and not bipolar disorder. Family Case Manager Erin Tomlinson testified that Mother at one point, while she was nursing B.V., said: "Ow, you bit me you stupid f------ child." Transcript Volume II at 16. She testified that Mother admitted to regularly smoking marijuana during her pregnancy while knowing the effects that marijuana can have on a child, and to smoking marijuana when B.V. was in the home. She testified that DCS had concerns about Mother's present living situation because she was living with Kevin Ruble in an apartment where Ruble was on home detention for previous drug charges and, when case managers and law enforcement arrived at the home for the detention, they detected a strong odor

of marijuana in the home. She testified that B.V. was placed in a foster home. After some discussion, the court stated "I'm going to be safe than sorry with a five-day old baby." *Id.* at 23.

[4] On March 8, 2018, the court held a hearing. Mother testified that she was living with her ex-boyfriend, Ruble, in November 2015, and subsequently began staying with her mother and grandmother before obtaining her own apartment two months before the hearing. She testified that she was no longer with Ruble and that she lived with Anthony Hubbard periodically for "a month or so." *Id.* at 31. She testified that she provided DCS or her caseworker with her current address, and that she was employed at McDonald's for "maybe two and a half weeks" and had previously worked at OSO and "Valleyo (phonetic)." *Id.* at 33-34. She testified that she agreed to participate in services and had an assessment in which it was recommended that she attend drug classes once a month. She stated that she called DCS every day to determine if she was on the drug screen list, that she was tested maybe two or three times a week, and that she had been visiting B.V. regularly. On cross-examination, Mother testified that she had been receiving clean drug screens for three months, that she had the support of her family, and that she felt she was able to stay free of THC or any other drug.

[5] Family Case Manager Chelsea Morgan ("FCM Morgan") testified that Mother calls about every five days which is concerning because there are certain drugs that would be out of her system within three to five days, but that Mother had generally tested negative on the screens. FCM Morgan testified that she did not

receive Mother's address until February. When asked if DCS had concerns regarding Mother's present housing because DCS had not been able to see it, she answered: "No, I don't have concerns, specifically for that. No." *Id.* at 55. DCS's attorney asked: "So is [DCS] okay with her apartment given her testimony, or does the department wish . . . ." *Id.* FCM Morgan answered: "We would like to go look at her house. Yes, we [are] concerned. I didn't understand." *Id.* On cross-examination, FCM Morgan acknowledged that she had Mother's correct address on February 7th but had not been to Mother's home since then, and that Mother called in fifteen times since December. She acknowledged that Mother completed her assessment at Centerstone, had been regularly visiting with B.V., and that reports from visitation had been positive.

[6] Rodney Fischer, the visit supervisor, testified that Mother did very well during the two two-hour visits per week with B.V., that she was "a loving doting mom," that she always appeared at every visit with a full diaper bag with everything needed, and that "she took good care of him." *Id.* at 62-63. He also testified that Mother was concerned about dirt under B.V.'s fingernails, pointed out that B.V. was being transported in an expired car seat, and provided a different car seat to transport him.

[7] Mother testified that there were a few times she did not call in "not because I didn't want to take a drug screen, but for the fact that I worked a lot and I was tired." *Id.* at 67. She testified that she never refused a drug screen, was willing to take a drug screen, and had been passing the screens for several months. She also testified that she did not feel like she needed services from Centerstone and

would be able to go there to obtain services on her own if she felt like she needed help.

[8]     The trial court stated:

>    So the issue today is if this child is [in] need of services, and I – as I sit here today I could make a finding that the child's in need of services based on where we started, and you know, the lack of her residency, the lack of a job, the testing positive for THC, people living in the home, a lot of those things have been alleviated. So I mean I could say that the child's not in need of services as well, because she's done a lot of things to remedy the situation.
>
>    I think there's a middle ground here that I'd like to explore, which is an in-home CHINS, just simply because I still think what I've heard is several short-term jobs. Not having had housing of her own for a long period of time. You know with a child this age short-term jobs don't work because you lose your housing, and having housing consistently is very important.
>
>    You know I haven't seen enough that I'm a hundred percent comfortable that we're a hundred – we're all the way there yet. But I do think that I don't see the dangers to the child that I saw when the child was detained either.
>
>    Mr. Ruble's no longer in the home. We do have residency, we have employment. She has to a great extent cooperated with the department, I think she would continue to do that if the child was in her home and being cared for [by] her. But I do think that, you know, she's young, the child's young, and a lot of things that are – that she's doing are in the right direction, but could easily slide backward, and that's why I think that a CHINS would be appropriate just to make sure that the drug – being drug free is consistent, being with a job is consistent, being with housing is consistent.

*Id.* at 69-70.  On March 20, 2018, the court entered an order finding B.V. to be a CHINS.

[9]     On March 27, 2018, the court held a dispositional hearing.  FCM Morgan testified that B.V. was placed with Mother.  She also testified that DCS had filed a petition for parental participation including that Mother participate in home-based casework, maintain stable housing, and undergo random drug screens and a psychological evaluation.  When asked the point of the psychological evaluation at that time, FCM Morgan answered:

> So a psychological evaluation is in there due to concerns with parenting and mental health and that basically would determine if there were any additional underlying mental health needs that weren't being addressed in therapy, that – when those were presented to the therapist, the therapist could address those things.

*Id.* at 82.

[10]    On April 4, 2018, the court entered a Dispositional Order and ordered Mother to participate in a treatment program or pay for services consistent with the recommendation of DCS, including that she contact the family case manager every week, allow the family case manager or other service providers to make unannounced visits to the home of the child, and participate in home-based casework through Healthy Families.  Mother was ordered to maintain suitable housing, and a legal and stable source of income, submit to random drug screens, obtain a substance abuse assessment if she tests positive, and ensure

that B.V. is properly clothed, fed, supervised, and will become engaged in a home-based counseling program.

## *Discussion*

The issue is whether the evidence is sufficient to support the court's determination that B.V. is a CHINS. Mother argues that the evidence is insufficient to determine that B.V. is a CHINS. DCS agrees and requests this Court to reverse.

In reviewing a trial court's determination that a child is in need of services, we neither reweigh the evidence nor judge the credibility of witnesses. *In re S.D.*, 2 N.E.3d 1283, 1286-1287 (Ind. 2014), *reh'g denied.* Instead, we consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* at 1287. As to issues covered by findings, we apply the two-tiered standard of whether the evidence supports the findings and whether the findings support the judgment. *Id.* We review remaining issues under the general judgment standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.*

The Indiana Supreme Court has cautioned that "[n]ot every endangered child is a child in need of services, permitting the State's *parens patriae* intrusion into the ordinarily private sphere of the family." *Id.* DCS alleged that B.V. was a CHINS pursuant to Ind. Code § 31-34-1-1, which provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

    (A) the child is not receiving; and

    (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[14]    The Indiana Supreme Court has interpreted this provision to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d at 1287.

[15]    Additionally, DCS alleged that B.V. was a CHINS pursuant to Ind. Code § 31-34-1-10, which provides:

Except as provided in sections 12 and 13 of this chapter, a child is a child in need of services if:

(1) the child is born with:

* * * * *

(C) any amount, including a trace amount, of a controlled substance, a legend drug, or a metabolite of a controlled substance or legend drug in the child's body, including the child's blood, urine, umbilical cord tissue, or meconium; and

> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; or
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[16] As noted, DCS agrees with Mother that reversal is required. Specifically, it states there is no evidence that Mother had any difficulty in meeting B.V.'s needs and that there were no findings that B.V. had any unmet needs. It asserts that the trial court's only concern was that Mother was young and could backslide, which does not satisfy the statutory dictates. DCS concedes that there was no evidence that Mother's marijuana use ever harmed B.V. and her visitation supervisor thought Mother did very well at visits and was loving and doting. Based upon DCS's agreement that reversal is required as well as our review of the record, we reverse the court's determination that B.V. was a CHINS. *See In re S.M.*, 45 N.E.3d 1252, 1256-1257 (Ind. Ct. App. 2015) (observing that there was "no evidence in the record showing how, specifically, marijuana-positive meconium endangered the child," finding that the evidence was insufficient to support the CHINS determination, and stating: "We are well aware that DCS and the courts are overwhelmed with the growing numbers of CHINS cases statewide. All would be better served if the system focused its time, efforts, and resources on the families who really need them. This one did not."); *see also Ad.M. v. Ind. Dep't of Child Servs.*, 103 N.E.3d 709, 714 (Ind. Ct. App. 2018) ("Following *In re S.M.*, without any specific evidence that the marijuana itself or Mother's use of it presented a serious danger to the Children,

we must conclude that the DCS failed to present sufficient evidence to support the CHINS determination.").

## *Conclusion*

[17]    For the foregoing reasons, we reverse the trial court's CHINS determination.

[18]    Reversed.


Altice, J., and Tavitas, J., concur.