

FILED

Jun 30 2023, 9:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT H.P.
(MOTHER)

Jane A. Noblitt
Columbus, Indiana

ATTORNEY FOR APPELLANT D.P.
(FATHER)

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Robert J. Henke
Director, Child Services Appeals
Unit
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

D.P. (Minor Child),

*Child in Need of Services,*

H.P. (Mother) and D.P. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child
Services,

*Appellee-Petitioner.*

June 30, 2023

Court of Appeals Case No.
22A-JC-2836

Appeal from the Jennings Circuit
Court

The Honorable Murielle S. Bright,
Judge

The Honorable Christopher
Doran, Magistrate

Trial Court Cause No.
40C01-2207-JC-30

**Opinion by Judge Kenworthy**
Judge Crone and Senior Judge Robb concur.

**Kenworthy, Judge.**

## Case Summary

The Indiana Department of Child Services ("DCS") received a report alleging possible abuse and neglect of four-year-old D. ("Child"), the son of D.P. ("Father") and H.P. ("Mother") (collectively, "Parents"). During the DCS investigation, some concerns were resolved, and others arose. Ultimately, the trial court determined Child was a child in need of services ("CHINS"). Parents separately appeal the trial court's determination, but both essentially claim the trial court clearly erred in adjudicating Child a CHINS. Concluding there was no error, we affirm the trial court's judgment.

## Facts and Procedural History

Child was born November 28, 2017. On May 4, 2022, DCS received a report Child "was seen with marks and bruises. He's non-verbal and unable to communicate what happened to him[.]" *Tr. Vol. 2* at 151.[1] The report also said Father "was arrested the beginning of [2022] for Possession of Meth[amphetamine] and . . . there was no sober caregiver in the home." *Id.* DCS caseworker JoAnn Miller began an investigation that eventually ruled out

---

[1] On DCS' motion, we consolidated Father's and Mother's separate appeals under this single cause number. Before the cases were consolidated, however, a transcript was prepared and filed for each parent's appeal. We have cited the transcript originally filed in cause number 22A-JC-2836.

physical abuse[2] and focused instead on Parents' substance abuse and their ability to be safe and sober caregivers for Child.

[3] Parents were uncooperative from the outset and, in late May, DCS sought and obtained an order compelling Parents to allow DCS into their home, give DCS access to Child, and provide drug screens. On DCS caseworkers' third attempt to serve the order, Mother finally allowed them into the home, but Child was not there. Parents had taken him to a relative's home because they knew DCS would be coming, but Mother gave caseworkers the address and they were able to visit Child there.

[4] Mother submitted to an oral drug screen at that time, but Father refused. Father only submitted to an oral drug screen after he was held in contempt in June and ordered to immediately submit to a drug screen or be jailed for ten days. While those samples were being tested, Child remained in Parents' care.

[5] In late June, DCS was called because Child had been found wandering alone about one-half mile from his rural home at 1:30 in the morning. Mother was asleep when Child left the house; Father was at a friend's house. Neither Parent was aware Child was missing until after he had been found. This was the second time Child left a residence without Parents' knowledge while in their care—the first time he left a relative's home during a family barbeque. DCS

---

[2] Child was diagnosed with an iron deficiency that explained the marks and bruises.

caseworker Ida Mae Craney met with Parents and discussed a safety plan to make the house more secure.

[6] During the investigation, DCS learned Father had pending criminal charges in two counties: (1) in Jennings County, Father was charged with possession of methamphetamine, possession of paraphernalia, and operating a motor vehicle with false plates, and (2) in Jackson County, Father was charged with Level 2 felony dealing in methamphetamine and possession of paraphernalia. The Jackson County charges arose from a February 2022 traffic stop where Father, the passenger, was found with over thirty grams of methamphetamine in his socks and underwear. DCS also learned Father had previously resolved charges of possession of methamphetamine, possession of paraphernalia, and operating a motor vehicle without ever receiving a license. Although Father pleaded guilty only to the motor vehicle charge—not the substance-related charges—Father's probation was revoked in 2021 because he tested positive for methamphetamine.

[7] DCS received Mother's drug-screen results in early June and received Father's results on July 6. Both screens were positive for methamphetamine. The day after receiving Father's drug-screen results, DCS sought an emergency detention order. The trial court entered the order the same day, and DCS took custody of Child on July 9. Child was initially placed in a foster home.

[8] The trial court found probable cause Child was a CHINS and authorized DCS to file a CHINS petition. The petition alleged Child was a CHINS in part

because: (1) Parents tested positive for methamphetamine after submitting to court-ordered drug screens; (2) Parents' substance abuse "has a negative impact on their ability to parent as they are not able to supply adequate supervision"; (3) Father has pending drug charges in multiple counties; (4) Child has a "high level of needs" and a tendency to put things in his mouth, "creating an elevated risk of serious harm if there were to be methamphetamine, paraphernalia, or other substances in the home"; and (5) the coercive intervention of the court is necessary because Parents demonstrated "an almost unparalleled lack of cooperation with DCS[.]" *Appellant's App. Vol. 2* at 39.[3] At an initial/detention hearing on July 11, Parents denied the allegations of the petition.

[9] In the two months between the initial and fact-finding hearings, Child was placed with his paternal grandmother ("Grandmother"). Parents visited Child regularly, but continued to refuse to cooperate with DCS, including refusing to submit to requested drug screens.

[10] The trial court held a CHINS fact-finding hearing on September 6, 2022.

[11] DCS offered the testimony of Dr. Aaron Brown, the Scientific Director at the laboratory that tested Parents' drug screens. Mother's screen was positive for 151.8 ng/ml of methamphetamine. Father's screen was positive for greater than 1000 ng/ml of methamphetamine. Dr. Brown explained an oral sample is

---

[3] As with the transcript, the consolidated appeal contains two appendices, one filed by Father and one filed by Mother. We have cited the appendix originally filed in cause number 22A-JC-2836.

considered positive for methamphetamine at 10 ng/ml. *See Tr. Vol. 2* at 101.[4] Mother's results were "far enough above the cut-off" to be consistent with use of methamphetamine rather than "something such as secondary or environmental exposure[.]" *Id.* at 104. The lab did not report a specific concentration for Father's sample because the level of methamphetamine was higher than the concentration range the lab tests for, in which case the industry standard is to report results as "greater than" the limit. *Id.* at 103. To a "reasonable degree of scientific certainty," Dr. Brown stated Parents used methamphetamine within twenty-four to forty-eight hours of providing the oral sample. *Id.* at 104.

[12]     Father acknowledged the results of his June 2022 drug screen showed a concentration "so high [it was] off the charts of what the lab is able to test for," but claimed the last time he used methamphetamine was "last year." *Id.* at 32. He attributed the results to "[h]aving [DCS] come in [his] life." *Id.* at 33. Father—who was thirty-five years old at the time of the hearing—first said he did not know when he started using methamphetamine, then said it was "[l]ast week," *id.* at 31, then claimed it was when he was thirty years old. Father explained why he did not submit to another DCS drug screen: "I don't think I should have to do any, . . . because the whole allegations [sic] was me beating

---

[4] Both Mother and Father also tested positive for amphetamine. Dr. Brown explained methamphetamine converts into amphetamine as it metabolizes but the process "does not go back the other way." *Id.* at 109. In other words, if a person has ingested methamphetamine, both methamphetamine and amphetamine will be present in a drug screen, but if a person has ingested amphetamine alone, there will not be any methamphetamine present. *See id.*

on my child. That's the whole reason why we're here." *Id.* at 33. When asked if he thought his substance use affected his ability to be a safe and sober caregiver for Child, he replied, "Not one bit." *Id.* at 34. He started a substance-abuse treatment program the year before as ordered in a criminal case but did not complete the program and was not in any treatment program as of the fact-finding hearing.

[13] Mother said she started using methamphetamine when she was twenty-eight—her age at the time of the fact-finding hearing. She testified she "never really used any before" DCS intervention, and denied using methamphetamine before Child was removed, despite the positive result from the May 2022 drug screen. *Id.* at 117. She claimed she had used methamphetamine only once, after Child was removed, but also told caseworkers she would test clean in two days if they returned Child to her care. Mother said "nobody else watches [Child]" except herself, Father, and now Grandmother and acknowledged Child needs to be supervised closely. *Id.* at 114. Father works outside the home, so Mother has been Child's full-time caregiver. But Mother did not think her substance abuse affected her ability to be a safe and sober caregiver because "it has nothing to do with [Child]." *Id.* at 121. Mother was diagnosed with bipolar disorder "[w]hen [she] was little." *Id.* at 148. She does not see a therapist and refused to say whether she takes medication "because that has nothing to do with this." *Id.* at 147. Mother was not concerned about Father's pending criminal charges related to possession of more than thirty grams of methamphetamine: "[I]t was

not around [Child] or me.  It was not in our home or in our vehicles." *Id.* at 128.

[14] As for the night Child got out of the house, Father said "[t]he mother was sleeping and he snuck out." *Id.* at 37.  Father explained he had gone to a friend's house after work that night—which could have been anywhere from 1:00 p.m. to 7:00 p.m.—and was coming home around 1:30 a.m. when Child was found.  Father denied using methamphetamine at his friend's house that night.  Mother conceded Child needs to be watched closely to "make sure he doesn't get out[.]" *Id.* at 113.  Parents said they had cameras and an alarm in their home even before Child got out, but asserted they followed the safety plan Craney discussed with them, adding alarms and extra door locks to their home.  They did not notify DCS they made those safety upgrades because they "didn't think [they] had to[,]" *id.* at 131, and did not let DCS into their home to observe the changes.

[15] Both parents visited Child at Grandmother's regularly.  Mother was there every day, usually from the time Child got up to the time he went to bed.  Father visited after he got off work at least every other day.  Grandmother testified she has not seen signs of drugs or alcohol when Parents visit: "I know when my son's not acting right . . . [and] I didn't know [Mother] even messed with [drugs] at all[.]" *Id.* at 86–87.  Grandmother told DCS caseworkers she believed Parents would "get clean to get [Child] back." *Id.* at 87.

[16]     When asked why Child was removed from his care, Father said, "I have no clue." *Id.* at 30. Mother believed the only reason Child was removed was "over child abuse and neglect because of the bruising. . . . [T]here was no other reason why he should've been taken." *Id.* at 114. Father admitted he had offered "[z]ero" cooperation to DCS. *Id.* at 56. Father repeatedly expressed his unwillingness to participate in any services "because [he] didn't ask for [any] help" and "really honestly" did not think he would benefit from substance-abuse services. *Id.* at 59. Similarly, Mother said she had been "doing everything a mom should do, but no, I am not going to cooperate with [DCS.]" *Id.* at 125. She would only take court-ordered drug screens because she felt "it's a[n] invasion of [her] privacy, invasion of [her] rights" for DCS to request screens. *Id.* Mother denied she had a substance-abuse problem and claimed a substance-abuse program "is not necessary." *Id.* at 121.

[17]     Miller, who began the DCS investigation, testified concerns for Child's safety still existed even after DCS received an explanation for the bruising. Independently, Miller observed signs of drug use in Father such as frequent pacing and a tendency to be high-strung in their interactions. The fact that Child "constantly is putting things in his mouth" concerned Miller because if methamphetamine was in the home, Child "could easily get into the substances[.]" *Id.* at 167. Miller testified Child "definitely needs supervision at all times" and requires "a sober caregiver who can be responsive" to his "pretty high level of needs[.]" *Id.*

[18]     Craney took over as the caseworker on July 29.  Craney testified a parent who is using methamphetamine is unable to provide adequate supervision, and especially so in this case because Child "doesn't talk very much [so] he can't say if he's being hurt, no one's watching him, things like that." *Id.* at 197.[5] With Parents' refusal to participate in subsequent drug screens, DCS had no way to verify whether Parents had stopped using methamphetamine.  And because Parents had expressed their unwillingness to participate in services unless ordered by the court to do so, Craney believed Child is a CHINS. Child's guardian ad litem, although praising Mother as "a wonderful mother," also believed Child is a CHINS and the family could benefit from services:  "I think my biggest concern is . . . substance abuse potentially happening in the home and [Child] not being able to express to us any concerns with that, so I would like to see some clean screens from [P]arents[.]" *Id.* at 212.

[19]     In adjudicating Child a CHINS as defined in Indiana Code Section 31-34-1-1, the trial court entered a thorough and thoughtful order.  The trial court's notable findings can be summarized as follows: (1) without an assessment and subsequent drug screens, the court only had evidence of positive screens and could not know the extent of Parents' substance abuse; (2) Parents "struggled with honesty" about their substance use, were not addressing it, and did not

---

[5] The initial report to DCS said Child was autistic and non-verbal.  However, there was no evidence of an autism diagnosis, although Mother had scheduled an evaluation for early 2023.  And DCS acknowledged "non-verbal isn't really the right term to describe [Child], but [it is] fair to say he can't communicate as an average four and a half[-]year[-]old can." *Id.* at 186.  Mother referred to Child's communication difficulties as a "speech delay." *Id.* at 112.

think it affected Child or their ability to provide a safe home for him, *Appellant's App. Vol. 2* at 83; (3) Child is a "high-needs child" who requires "sober and clearheaded" parents who can adequately supervise him at all times, *id.* at 83, 88; (4) among the "significant risks" to Child are his inability to communicate whether he is safe and the possibility of medical consequences if he ingested methamphetamine, *id.* at 87; (5) Parents' positive screens coupled with Mother's testimony only she and Father previously provided care for Child means they cared for him while using methamphetamine; (6) parents who actively use methamphetamine cannot provide adequate supervision; (7) a "nexus exists between [P]arents' substance [abuse] and [Child's] safety"—the fact that Child managed to leave the home in the middle of the night despite existing cameras and alarms in the home is connected to a "dangerous lack of supervision and serious endangerment[,]" *id.*; and (8) coercive intervention is required because Parents have not allowed DCS into the home to observe their compliance with the safety plan, have not complied with requests for drug screens, and have expressed their unwillingness to cooperate with DCS.

[20] Having determined Child was a CHINS, the trial court entered a dispositional order on November 1, 2022. Father and Mother now appeal.

## Discussion and Decision

### *Standard of Review*

[21] In a CHINS proceeding, the State must prove by a preponderance of the evidence a child is a CHINS as defined by statute.[6]  Ind. Code § 31-34-12-3 (1997); *see In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010).  When we review a CHINS adjudication for sufficient evidence, we neither reweigh evidence nor judge witness credibility but consider only the evidence and reasonable inferences supporting the trial court's decision.  *In re D.J.*, 68 N.E.3d 574, 577–78 (Ind. 2017).

[22] Although "no statute requires special findings in a CHINS fact-finding order," *In re S.D.*, 2 N.E.3d 1283, 1288 (Ind. 2014), the trial court here entered *sua sponte* findings in its order on the fact-finding hearing.  We will "not set aside the findings or judgment unless clearly erroneous[.]"  Ind. Trial Rule 52(A).  As to issues covered by the findings, we review whether the evidence supports the findings and the findings support the judgment.  *S.D.*, 2 N.E.3d at 1287.  "Factual findings 'are clearly erroneous if the record lacks any evidence or reasonable inferences to support them [and] . . . a judgment is clearly erroneous

---

[6] Indiana Code Chapter 31-34-1 contains several sections defining when a child is a CHINS.  The CHINS petition in this case alleged Child was a CHINS under Indiana Code Sections 31-34-1-1 (parental inability, refusal, or neglect to supervise) and 31-34-1-2 (parental act or omission seriously endangering child's physical or mental health).  Because the physical abuse allegation was resolved before the fact-finding hearing, DCS proceeded only on the neglect allegation.  *See Tr. Vol. 2* at 219 (DCS stating, "We are not asking the Court to find that [Child] was a victim of physical abuse but rather simply neglect.").

when it is unsupported by the findings of fact and the conclusions relying on those findings.'" *In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014) (quoting *In re T.W.*, 859 N.E.2d 1215, 1217 (Ind. Ct. App. 2006)) (alteration in original). We review any issue not covered by the findings under the general judgment standard, meaning the judgment will be affirmed based on any legal theory supported by the evidence. *S.D.*, 2 N.E.3d at 1287.

*CHINS Adjudication*

[23]     The purpose of a CHINS inquiry is to determine whether a child's circumstances require services unlikely to be provided without court intervention. *N.E.*, 919 N.E.2d at 106. Therefore, a CHINS adjudication focuses on the child's condition rather than the parents' culpability. *Id.* at 105.

[24]     The trial court found Child was a CHINS as defined in Indiana Code Section 31-34-1-1 (2019). A CHINS adjudication under this section requires DCS to prove by a preponderance of the evidence:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent . . . to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; . . . and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and

> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

In other words, there must be sufficient evidence supporting three basic elements: Parents' actions or inactions have seriously endangered Child, Child's needs are unmet, and those needs are unlikely to be met without State coercion.[7] *See S.D.*, 2 N.E.3d at 1287. The last element guards against unwarranted State interference in family life because "[n]ot every endangered child is a child in need of services, permitting the State's *parens patriae* intrusion into the ordinarily private sphere of the family." *Id.* For this reason, when determining CHINS status under Section 31-34-1-1, courts should consider the family's condition not just when the case was filed, but also when it is heard. *D.J.*, 68 N.E.3d at 580.

[25] Because a CHINS adjudication focuses on the condition of the child, "the acts or omissions of one parent can cause a condition that creates the need for court intervention." *N.E.*, 919 N.E.2d at 105. In general, then, a separate analysis as to each parent is not required. *Id.* at 106. Although Parents filed separate appeals, they essentially argue the same thing: the trial court's CHINS determination was clearly erroneous because DCS failed to prove (1) any parental neglect that seriously endangered Child, (2) Child had unmet needs, or (3) Child's needs are unlikely to be met without State intervention. *See Father's*

---

[7] There is also an age element that is not in dispute here. *See* Ind. Code § 31-34-1-1.

*Br.* at 10; *Mother's Br.* at 10.  They each acknowledge one positive drug test but argue there was no evidence they used or possessed methamphetamine in Child's presence, cared for Child while under the influence of methamphetamine, or endangered Child by their use of methamphetamine.  *See Father's Br.* at 10; *Mother's Br.* at 11.

[26]     Father and Mother both cite *In re S.M.*, 45 N.E.3d 1252 (Ind. Ct. App. 2015), and *In re Ad.M.*, 103 N.E.3d 709 (Ind. Ct. App. 2018), for the proposition that a trial court clearly errs in adjudicating a child a CHINS when "there is no evidence that the parents have ever used drugs in the presence of the children, or that there was ever an occasion in which they were impaired by substance abuse while the children were in their care[.]"  *Father's Br.* at 14 (quoting *S.M.*, 45 N.E.3d at 1256); *see Mother's Br.* at 12.

[27]     In *S.M.*, four children were adjudicated CHINS after the youngest child's meconium tested positive for marijuana.  *See* 45 N.E.3d at 1253.  The children's mother admitted at the fact-finding hearing she used marijuana one time during her pregnancy, but testified she did not know she was pregnant at the time and did not use marijuana again after learning of the pregnancy.  Within a month of the CHINS petition being filed, the mother began completing random drug screens approximately every two weeks, all of which were negative.  The mother also completed a substance-abuse assessment.  The assessor said the mother was "insightful" about her marijuana use and did not recommend any substance-abuse treatment.  45 N.E.3d at 1253–54.  A panel of this Court reversed the trial court's CHINS determination because DCS offered no

evidence the children were endangered at any time, their needs were unmet on even a single occasion, or their needs would not be met without State coercion. *Id.* at 1256. The Court specifically noted a lack of evidence showing how marijuana-positive meconium endangers a child, or any occasion the mother was impaired by substance abuse while caring for the children.

[28] In *Ad.M.*, marijuana plants were found in the mother's home, and she tested positive for marijuana twice after a CHINS petition was filed. 103 N.E.3d at 711-12. A DCS case manager testified the mother was a "chronic" marijuana user but stated she "really can't see the way [marijuana use] has impacted" the children. *Id.* at 713–14. Following the lead of *S.M.*, the Court in *Ad.M.* concluded DCS failed to present sufficient evidence children had been seriously endangered for purposes of Indiana Code Section 31-34-1-1 because there was no "specific evidence that the marijuana itself or [the m]other's use of it presented a serious danger to the [c]hildren." *Id.* at 714.

[29] These cases are easily distinguishable. The parent in *S.M.* admitted her one-time drug use and cooperated with DCS. Here, Parents did not admit to using methamphetamine despite their positive drug screens. Mother claimed she used methamphetamine only once—after Child was removed—and Father claimed he last used methamphetamine last year, but the trial court specifically found Parents' testimony about their drug use lacked credibility. Parents exhibited no insight into their substance use, denying they have a problem with methamphetamine and believing their use of methamphetamine has nothing to do with Child or their ability to take care of him. Parents' ongoing drug use can

be inferred from testimony that Mother told DCS caseworkers "she'd test clean in two (2) days" if Child were returned and having Child back in her home "would make [her] be clean," *Tr. Vol. 2* at 119, and Grandmother believed Parents "will get clean" to get Child back, *id.* at 87. Further, Parents refused to cooperate with DCS while the CHINS petition was pending even when doing so could have eased DCS' concerns.

[30] And contrary to the lack of evidence of endangerment in *Ad.M.*, there *is* evidence here Parents' methamphetamine use presented a serious danger to Child. Father's drug use has resulted in legal problems, including a Level 2 charge of dealing in methamphetamine still pending at the time of the fact-finding hearing. Child has been observed to often put things in his mouth, so the presence of methamphetamine or any other drug in the home presents a particular danger to him.[8] Further, although no evidence suggests Parents used methamphetamine in Child's presence, Mother is Child's full-time caregiver and only she and Father watched Child prior to his removal. As Parents had positive drug screens before Child was removed, it is reasonable to infer they were using methamphetamine while caring for Child. Mother acknowledged

---

[8] The State of Indiana's 2021 Annual Report of Child Abuse & Neglect Fatalities in Indiana—the most recent report available—details sixty child fatalities attributed to caregiver abuse or neglect, with six of the children dying of drug overdoses (primarily fentanyl) and at least two of those children were observed putting loose drugs or paraphernalia in their mouths. State of Indiana, Annual Report of Child Abuse & Neglect Fatalities in Indiana (2021), https://www.in.gov/dcs/files/2021_Annual_Report_of_Child_Abuse_and_Neglect_Fatalities_in_Indiana.pdf [https://perma.cc/KFS6-EPQJ]; *cf.* Ind. Evidence Rule 201 (permitting a court "at any stage of the proceeding" to take judicial notice of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

Child requires close supervision, yet Child was able to leave the family home undetected in the middle of the night. Craney testified parents using methamphetamine are unable to provide adequate supervision for children. When there is a lack of supervision and the home lacks adequate safety features, any child faces a danger—but especially *this* child in light of his special needs. Finally, the *Ad.M.* court concluded "evidence of *one* parent's use of *marijuana* and evidence that marijuana has been found in the family home, *without more*, does not demonstrate that a child has been seriously endangered for purposes of Indiana Code Section 31-34-1-1." 103 N.E.3d at 713–14 (emphasis added). Here, *both* Mother and Father tested positive for *methamphetamine*, and there was additional evidence of neglect beyond the mere use of the drug. Although Parents equate the marijuana use addressed in *S.M.* and *Ad.M.* with their methamphetamine use, there is evidence in this case of the specific dangers posed to Child by Parents' methamphetamine use.

[31] The sole finding (among fifty-two total findings) challenged on appeal by either Father or Mother is the following:

> 49) Mother cites to *In re K.S.*, 78 N.E.3d 740 (Ind. [Ct.] App. 2017)[,] in her assertion that DCS has failed to meet its burden in proving [Child] is seriously endangered. However, in that case, [the m]other had used marijuana two months prior to the [c]hild's birth and DCS did not present any evidence that the child was endangered. In the instant case, [Child's] parents have used methamphetamine (a more dangerous drug) while actually caring for him and impacting their ability to care for [Child] and provide proper supervision. [Child] has been seriously

> endangered as evidenced by his escape from the home in the
> middle of the night.

*Appellant's App. Vol. 2* at 88.  Father takes issue with the statement
"methamphetamine [is] 'a more dangerous drug'" than marijuana because the
trial court "offer[ed] no methodology by which to determine which is a 'more
dangerous drug[.]'"  *Father's Br.* at 15.

[32]   First, we note even if this isolated statement is erroneous, the rest of this finding
as well as the other unchallenged findings support the trial court's CHINS
determination.  *See Kanach v. Rogers*, 742 N.E.2d 987, 989 (Ind. Ct. App. 2001)
("Superfluous findings, even if erroneous, cannot provide a basis for reversible
error.").  The evidence and reasonable inferences from the evidence show
Parents used methamphetamine while caring for Child, their ability to
adequately supervise him was affected, and he was endangered due to the lack
of proper supervision.

[33]   In any case, whether or not methamphetamine is a "more dangerous" drug
than marijuana, methamphetamine is no doubt a *different* drug than marijuana
and should be treated as such.  Methamphetamine is a "highly addictive drug
with potent central nervous system . . . stimulant properties."  DEA Drug Fact
Sheet, Methamphetamine at 1 (2022),
https://www.dea.gov/sites/default/files/2023-
03/Methamphetamine%202022%20Drug%20Fact%20Sheet_1.pdf,

[https://perma.cc/C7R7-XVLC].[9]  Methamphetamine causes effects similar to cocaine.  *Id.* at 2.  But methamphetamine "has a much longer duration of action, and a larger percentage of the drug remains unchanged in the body." National Institute on Drug Abuse ("NIDA"): Methamphetamine Research Report at 6 (2019), https://nida.nih.gov/download/37620/methamphetamine-research-report.pdf?v=59d70e192be11090787a4dab7e8cd390, [https://perma.cc/PVM6-U36S].  In 2021, approximately 32,500 people died from an overdose involving stimulants other than cocaine—"primarily methamphetamine."  *Id.* at 4.  In contrast, "[n]o deaths from overdose of marijuana have been reported."  DEA Drug Fact Sheet: Marijuana/Cannabis at 3 (2022), https://www.dea.gov/sites/default/files/2023-03/Marijuana-Cannabis%202022%20Drug%20Fact%20Sheet.pdf, [https://perma.cc/63W6-7XRW].  And most importantly for this discussion, "[p]arents who use, manufacture, and/or traffic methamphetamine in the presence of children put their children at a higher risk of child abuse and neglect."  National Center on Substance Abuse and Child Welfare: Supporting Children Affected by Parental Methamphetamine Use at 1 (2021), https://ncsacw.acf.hhs.gov/files/meth-tip-sheet-children.pdf, [https://perma.cc/EF55-UPAK].  The 2021 Annual Report of Child Abuse & Neglect Fatalities in Indiana reported methamphetamine was involved in eleven of the sixty child deaths from caregiver maltreatment and noted a history of substance abuse was most frequently cited as a stress factor

---

[9] *See* Evid. R. 201; *supra* n. 8.

among caregivers. State of Indiana, Annual Report of Child Abuse & Neglect Fatalities in Indiana (2021), https://www.in.gov/dcs/files/2021_Annual_Report_of_Child_Abuse_and_Neglect_Fatalities_in_Indiana.pdf, [https://perma.cc/KFS6-EPQJ].

[34] In sum, unlike *S.D.* and *Ad.M.*, this is not a case of a single incident of marijuana use prompting DCS intervention. Nor is this even a case of a single incident of methamphetamine use but nothing more. *See In re L.P.*, 6 N.E.3d 1019, 1021 (Ind. Ct. App. 2014) (reversing a CHINS adjudication where DCS proved a single use of methamphetamine, there was no suggestion the use of methamphetamine took place in the presence of the child, and the parent voluntarily and consistently took drug screens with negative results); *Perrine v. Marion Cnty. Off. of Child Servs.*, 866 N.E.2d 269, 277 (Ind. Ct. App. 2007) (reversing a CHINS adjudication because "a single admitted use of methamphetamine, outside the presence of the child and *without more*, is insufficient to support a CHINS determination") (emphasis added). This is a case of untreated methamphetamine use of unknown frequency and duration endangering a special-needs child's safety and well-being.

[35] The trial court's unchallenged findings support this CHINS determination. Among them: Parents use methamphetamine; Child is a "high-needs child" who requires close supervision; as Child's primary caregiver, Mother "necessarily" cared for him while using methamphetamine; Parents do not recognize their use of methamphetamine affects their ability to provide a safe

home for Child; and a "nexus exists between [P]arents' substance [use] and [Child's] safety." *Appellant's App. Vol. 2* at 87–88.

[36] The family's condition at the time of the fact-finding hearing had not improved since the CHINS petition was filed. *See In re D.J.*, 68 N.E.3d at 580–81 (reversing CHINS determination where the trial court's findings "amply support[ed] its conclusion" parents needed coercive intervention early in the CHINS proceeding but "certainly did not show [they] needed such intervention" by the time of the fact-finding hearing). There was evidence before the court Parents had used methamphetamine while caring for Child and did not appreciate the dangers Child faced because of their use. And given the trial court found Parents' testimony about their methamphetamine use lacked credibility, there was no evidence Parents had stopped or were seeking to stop using methamphetamine. A court need not "wait until a tragedy occurs to intervene." *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009).

## Conclusion

[37] DCS proved Child—a four-year-old, special needs toddler—has been seriously endangered by Parents' methamphetamine use because their inability to supervise Child has already led to him leaving the home and roaming outside alone at night; Child needs care and supervision he is not receiving; and Parents' lack of cooperation with DCS shows they are unlikely to provide the care and supervision Child needs without the coercive intervention of the court. The trial court's CHINS determination is not clearly erroneous.

Affirmed.

Crone, J., and Robb, Sr. J., concur.