FILED

Feb 23 2026, 9:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



I N T H E

# Court of Appeals of Indiana

In the Matter of A.M., G.G., and A.G. (Children in Need of Services), and A.C. (Mother),

*Appellant-Respondent*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

February 23, 2026

Court of Appeals Case No.
25A-JC-2407

Appeal from the Vanderburgh Superior Court

The Honorable Gary Schutte, Judge
The Honorable Renee A. Ferguson, Magistrate
The Honorable Beverly Corn, Referee

Trial Court Cause No.
82D04-2505-JC-723
82D04-2505-JC-724
82D04-2505-JC-725

**DeBoer, Judge.**

## Case Summary

[1] A.C. (Mother) appeals the trial court's determination that her children, A.M., G.G., and A.G. [collectively, the Children], are children in need of services (CHINS). Mother argues that the court's findings of fact are clearly erroneous because they were copied verbatim from the factual allegations asserted in the CHINS petitions. She further contends that most of the court's findings are not supported by evidence presented at the fact-finding hearing and, in any event, neither the evidence nor the court's findings thereon support the CHINS determinations. Finding no clear error, we affirm.

## Facts and Procedural History

[2] Mother and M.G. (Father M.G.) are the parents of G.G. (born July 2010) and A.G. (born October 2016). Mother and R.M. (Father R.M.) are the parents of A.M. (born October 2021).

[3] Mother and Father R.M. were in a relationship for about three years but broke up after A.M.'s birth. On May 6, 2025, Mother took A.M. to visit Father R.M. at his house. During the visit, police officers were dispatched to the house for a domestic disturbance. After speaking with Mother, Father R.M., and A.M., the officers determined that Mother and Father R.M. had each committed acts of

violence against one another, so they were both arrested. After arresting Mother, the officers found five grams of marijuana in her possession. The State charged Mother with domestic battery, intimidation, and possession of marijuana, and Father was charged with domestic battery.

[4] Because Mother and Father R.M. were both in jail—and since Father M.G. was in prison for a prior unrelated conviction—the Department of Child Services (DCS) determined that the Children should be detained on an emergency basis. On May 9, DCS filed three petitions alleging the Children were CHINS. The petitions contained substantively identical factual allegations, which were as follows:

> a.  On 5/6/2025 [DCS] received a report alleging[] A.M. (3 years old), [A.G.] (8 years old)[,] and [G.G.] (14 years old) to be victims of neglect. The alleged perpetrator is [Mother].
>
> b.  On 5/6/2025, officers . . . were dispatched to [Father R.M.'s home] for a domestic violence in progress.
>
> c.  [Mother] advised officers . . . that she was physically assaulted by [Father R.M.]. A search of [Mother's] person found her to be in possession of [five] grams of marijuana.
>
> d.  [Mother] admitted to [a DCS Family Case Manager (FCM)] that she smokes marijuana daily. She also takes suboxone though she does not have prescription [sic] for suboxone. [Mother] stated she cares for her children every day.
>
> e.  [Father R.M.] advised officers . . . that he was physically assaulted by [Mother]. [Father R.M.] was observed to have

scratch-looking marks on his stomach. He further advised that [Mother] had pointed a gun at him. The gun turned out to be a BB gun.

f.       [Father R.M.] admitted to [the] FCM [] that he knew [Mother] was taking suboxone and using marijuana.

g.       A.M. witnessed the domestic violence. A.M. did say she was pushed out of the home by [Father R.M.].

h.       [Mother] was arrested and charged with [domestic battery in the presence of a child less than sixteen, intimidation, and possession of marijuana].

i.       [Father R.M.] was arrested and charged with [domestic battery in the presence of a child less than sixteen with a prior unrelated conviction for battery].

j.       [Mother] has a protective order (PO) against [Father R.M.][.] The PO is set to expire on 5/16/2025. [Mother] and [Father R.M.] both admitted to knowing they should not have contact with each other.

k.       [A.G.] and [G.G.]'s father is [Father M.G.]. [Father M.G.] is currently incarcerated[.] His projected release date is 8/21/2025. Due to his incarceration, [Father M.G.] has failed to provide [A.G.] and [G.G.] with the necessary food, clothing, shelter, medical care, education, or supervision.

l.       The [Children] need[] care, treatment, or rehabilitation that [they] are not receiving and is unlikely to be provided or accepted without the coercive intervention of the Court.

Appellant's Appendix Vol. 2 at 111-12 (alleging G.G. to be a CHINS); *see also id.* at 32-33 (alleging A.M. to be a CHINS), 161-62 (alleging A.G. to be a CHINS).  At a combined detention hearing, the trial court ordered that the Children should remain in DCS's custody.

[5] On June 11, the trial court held a hearing on the CHINS petitions.  Father R.M., who was still in jail, appeared at the hearing virtually.  Mother, who had bonded out, was not in the court room when the hearing started, though her attorney was present.  Father M.G. did not appear.  The court began the hearing without Mother and Father M.G. and defaulted both of them for failure to appear.  Father R.M. denied that A.M. was a CHINS but waived a formal fact-finding hearing.  He also agreed that the court could rule on A.M.'s petition based on the information contained in DCS's case file, which included DCS's preliminary inquiry report.  The court initially determined that all three of the Children needed services.  But after it had done so, Mother arrived at the hearing late and requested a formal fact-finding.  The court then rescinded the CHINS determinations and scheduled a fact-finding hearing.

[6] At a pre-trial conference in July, Mother and Father R.M. were present, but Father M.G. was not.  Mother told the trial court that she no longer wanted to have a formal fact-finding hearing and agreed that the court could rule on the petition based on the information in DCS's case file.  The court again determined that the Children were CHINS and scheduled a dispositional hearing for August.

[7]     Mother again arrived late for the August dispositional hearing,[1] and in her absence the trial court "issue[d] its standard dispositional order" for each child. *Id.* at 9, 20, 29. After Mother arrived, she said that she wanted to rescind her waiver of a formal fact-finding and requested the CHINS adjudications and the dispositional orders be rescinded. The court granted that request over DCS's objection and set a fact-finding hearing for later in the month.

[8]     At the fact-finding hearing, DCS's first witness was the officer who arrested Mother on May 6. The officer testified that after he arrived at Father R.M.'s home, he and other officers who were already at the scene "separated [Mother] and [A.M.] from the situation[.]" Transcript at 7. He then spoke with Mother "while other officers spoke to [Father R.M.]." *Id.* Mother told him that she had an argument with Father R.M. that turned physical. Father R.M. had grabbed Mother by the hoodie she was wearing, dragged her out of the house, then tried to hit her over the head with a cooler. Mother also claimed that she had a knot on her head, but the officer could not see it because her hair was covering it. The officer did see friction burns on Mother's neck.

[9]     Mother told the officer that A.M. had witnessed the altercation, and that at one point Father R.M. "pushed" A.M. *Id.* at 8. The officer described his observations of A.M. as follows:

---

[1] We have not been provided transcripts of the June 11 hearing, the July pre-trial conference, or the August dispositional hearing, so we have relied on the trial court's hearing journal entries on the Chronological Case Summaries to determine what happened at those hearings. *See* Appellant's App. Vol. 2 at 7-9, 18-20, 27-29.

[A.M.] didn't really understand . . . the full extent of what was going on, so she was frightened. And once we separated her from the situation, she went towards her grandpa's car, and she was sitting in the back seat. But she was clearly kind of distraught from what she had seen. But after talking to her and getting her . . . calmed down, she seemed okay. But . . . she did see most of what happened, and she was willing to tell me with the consent of [Mother].

*Id.* at 10.

[10] When DCS's attorney asked the officer "[w]hat led [him] to arrest [Mother][,]" the officer said that while he was speaking with Mother, "one of the officers on the radio asked [him] to place [Mother] in handcuffs and to read her Miranda rights[.]" *Id.* at 8. But when the officer tried to recount what Father R.M. had told the other officers that led to the decision to arrest Mother, Mother's counsel objected on hearsay grounds. The trial court sustained that objection and ruled that "anything [Father R.M.] said" was inadmissible. *Id.* at 8-9.

[11] The officer then described that after Mother's arrest, other officers found marijuana in her possession. He also said that when the officers searched Father R.M.'s home, they found a BB gun that had been "involved" in the incident. *Id.* at 9. But he did not provide many details to indicate how the BB gun was involved other than that "[Mother] was the one that was in possession of it." *Id.* at 10.

[12] At the end of the officer's direct examination, DCS offered into evidence a set of "certified records" pertaining to Mother's then-pending criminal charges

stemming from the May 6 incident. *Id.* at 11. Mother's counsel said she had no objection to those records, and the trial court admitted them without objection. Among them was a probable cause affidavit from the arresting officer that provided additional details of Mother's and Father R.M.'s arrests. According to the affidavit, A.M. told the officer who arrested Mother that she had seen "daddy push[] mommy" before dragging Mother out of the house. Exhibits at 18. When the officer asked A.M. "if mommy ever hit daddy," A.M. said "yes," but did not share any additional information with the officer. *Id.*

[13] The affidavit also recounted the officer's conversation with Father R.M. Father R.M. told the officer that the incident began when Mother accused him of stealing her phone and then tried to reach into his pockets to search for it. He pushed Mother away, but she "continued to come after him and scratched him several times on the stomach." *Id.* The officer saw marks on Father R.M.'s stomach that looked like scratch marks. According to Father R.M., Mother then aimed what he thought was a real gun at him (but which turned out to be a BB gun), so he grabbed it from her and discarded it. He then dragged Mother outside the house by her ankle. When he let her go, Father R.M. claimed that Mother threw a piece of wood at him, which hit his right leg.

[14] After introducing those records, DCS called Mother as its second and final witness. Mother testified that Father R.M. had been violent with her during their relationship, and at one point tried to "kidnap[]" A.M. while Mother was living in a domestic violence shelter. Tr. at 16. She explained that after the kidnapping incident, Father R.M. had been required to participate in supervised

visits, but he had been refusing to attend those visits. Nonetheless, Mother continued to take A.M. to visit Father R.M. at his house.

[15] Mother said that she "[didn't] like [Father R.M.] being left alone with [A.M.] . . . [b]ecause she [didn't] know if [she] was ever going to see [her] daughter again." *Id.* at 17. And Mother "still [didn't] trust him" based on the prior incident in which Father R.M. "took off with [A.M.][.]" *Id.* When asked why she was still taking A.M. to visit Father R.M. despite that distrust, Mother said, "[A]t the end of the day, that is her father, and after so many years of her not seeing him, . . . I don't want to be a bad mom." *Id.* at 18. When asked about how often she went to Father R.M.'s house, Mother said "[n]ot a lot[,]" but did volunteer that she also occasionally took A.G. to Father R.M.'s house with her and A.M. (though she never did the same with G.G.). *Id.* at 24.

[16] When DCS asked her about the details of the May 6 altercation, Mother invoked her Fifth Amendment right against self-incrimination, which the trial court permitted her to do since the domestic battery, intimidation, and marijuana charges were still pending. Mother agreed with DCS that "children witnessing domestic violence is not good[.]" *Id.* at 26. When asked if she had "the ability to keep [Father R.M.] away from [her] children[,]" Mother said she did not and that she couldn't "control him at all." *Id.* at 27-28. The following exchange then occurred between Mother and DCS's attorney:

> [DCS:] Do you believe your kids need services to address the domestic violence that they may or may not have witnessed or heard about?

[MOTHER:] Well, [A.M.]'s definitely going to have to have therapy due to everything that she's been through.

Q What about your other two children?

A . . . [W]e're actually all going to do it, because at the end of the day, my kids are my world.

Q [] Do you have that – did you have that set up, or is it something you have yet to do?

A I'm just trying to get them back in my care, and I'm going to go from there.

*Id.* at 28.

DCS also asked about Mother's failure to comply with services after her release from jail. Mother admitted that she had not participated in services or supervised visits with the Children. She claimed, however, that she would have been doing those things if not for "a really big misunderstanding [and] a lack of communication between [her] and the" service providers. *Id.* at 21. When pressed further about that "misunderstanding," Mother conceded that she had altogether refused to participate in services because she did not believe she or the Children needed them. The supposed "miscommunication" pertained only to Mother's unsuccessful attempts to coordinate supervised visits.

Mother also testified that she had refused a request from her first case manager to meet with him. According to Mother, "he said if [she] wasn't court-ordered, [she] didn't have to cooperate, so [she] didn't cooperate." *Id.* at 24. DCS then

asked, "So it's going to take a court order to get you to cooperate[?]" which prompted Mother to say no and explain that she had voluntarily attended a meeting with her second case manager. *Id.*

[19] Toward the end of Mother's testimony, DCS asked her if she "need[ed] substance abuse treatment[.]" *Id.* at 29. Mother said no and added, "That's not the problem at all. The problem is I want this case to be dismissed." *Id.* Earlier, DCS had asked Mother if she was using marijuana at the time of the May 6 incident, and in response Mother invoked the Fifth Amendment. Mother did the same when DCS asked her, "If we drug test you today, would you be clean?"[2] *Id.* at 27.

[20] Finally, Mother testified that she did not have stable housing and she sometimes stayed with her grandparents, but other times she slept on friends' couches. During her cross-examination, she told the trial court that she "would like to have help . . . getting a place to stay." *Id.* at 29.

[21] After Mother's testimony, DCS's attorney said she "had planned on calling the caseworkers" but believed she had "met [her] burden" based on "Mother's testimony[.]" *Id.* at 30. DCS then rested its case and briefly argued that "this family needs some help, and while there might be some bad blood with past

---

[2] On appeal, DCS draws our attention to the fact that Mother tested positive for methamphetamine after the fact-finding hearing. Since that positive drug test was not admitted at the fact-finding hearing or otherwise introduced as evidence in support of the CHINS petitions, we have not considered it in our review of the trial court's CHINS determinations. *See* Discussion and Decision *infra* (explaining that DCS must prove its case by evidence presented at the fact-finding hearing).

[case]workers, . . . it sounds like [Mother] is struggling and needs the help." *Id.* Mother's attorney then presented no evidence and said she had "[n]o argument." *Id.* at 31.

[22] Before making its decision on the CHINS petitions, the trial court had the following exchange with Mother:

> THE COURT: . . . You['re] telling me you need help. You do need help, okay? You do. You need help with housing. Your kids have been through a lot. They need help with that, processing that, putting themselves in a position so when they're our age, they can function appropriately, right?
>
> [MOTHER]: That is correct.

*Id.* at 31-32. The court then ruled from the bench that the Children were CHINS.

[23] After the hearing, the court issued three separate written orders adjudicating the Children as CHINS, each of which contained findings of fact that were identical to the allegations in the CHINS petitions. *See* Appellant's App. Vol. 2 at 226-27 (adjudicating A.M. a CHINS), 233-34 (adjudicating G.G. a CHINS), 240-41 (adjudicating A.G. a CHINS).

[24] The trial court held a dispositional hearing in September, after which it issued dispositional orders granting wardship of the Children to DCS and ordering Mother to, among other things, participate in services recommended by DCS,

cooperate with the FCM and service providers, submit to random drug screens, and attend scheduled visits with the Children. Mother now appeals.[3]

## Discussion and Decision

[25] When the State alleges a child needs services, it "must prove by a preponderance of the evidence that [the] child is a CHINS as defined by the juvenile code." *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012) (quoting *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010)). We give considerable deference to a trial court's CHINS determination, and we "do not reweigh evidence or judge witness credibility." *In re D.J.*, 68 N.E.3d 574, 577-78 (Ind. 2017). In our review, "we consider only the evidence that supports the trial court's decision and [the] reasonable inferences drawn therefrom." *Id.* at 578 (quoting *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014), *reh'g denied*).

[26] A trial court need not enter findings of fact to support a CHINS determination. *See S.D.*, 2 N.E.3d at 1287 ("Unlike CHINS dispositional decrees . . . no statute expressly requires formal findings in a CHINS fact-finding order[.]"). But when, as here, the court has done so sua sponte, its findings control as to the issues they cover. *Id.* For any such issue "covered by the findings, we apply the two-tiered standard of whether the evidence supports the findings, and whether the findings support the judgment." *Id.* With any issue for which the court did not enter findings, we apply the general judgment standard and will affirm the

---

[3] Neither Father R.M. nor Father M.G. participated in this appeal.

trial court's judgment "if it can be sustained on any legal theory supported by the evidence." *Id.* (quoting *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997)).

[27] Here, DCS alleged the Children were CHINS under Indiana Code section 31-34-1-1, which provides:

> A child is a [CHINS] if before the child becomes eighteen [] years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent . . . to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>
> > (A) when the parent . . . is financially able to do so; or
> >
> > (B) due to the failure, refusal, or inability of the parent . . . to seek financial or other reasonable means to do so; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Our Supreme Court has synthesized section 31-34-1-1 as "requir[ing] three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that

those needs are unlikely to be met without State coercion." *S.D.*, 2 N.E.3d at 1287. The State must prove these elements by a preponderance of the evidence. *N.E.*, 919 N.E.2d at 105 (citing Ind. Code § 31-34-12-3).

[28] On appeal, Mother contends that the trial court's findings of fact are clearly erroneous in several respects. First, she argues that findings (d), (f), (g), and (k) are not supported by evidence presented at the fact-finding hearing because they are based on facts from DCS's preliminary inquiry report, which was not admitted into evidence.[4] Relatedly, she claims that the findings "are inadequate as they are a mere verbatim recitation of the allegations contained in the CHINS Petitions." Appellant's Brief at 9. She further asserts that the evidence did "not show that the Children's physical or mental conditions are seriously impaired or seriously endangered[.]" *Id.* at 10. Finally, Mother contends that there was "no evidence to support [the] need for coercive intervention[.]" *Id.* at 13. We address these arguments in turn.

## 1. Findings (d), (f), (g), and (k)

[29] Mother first argues that findings (d), (f), (g), and (k) are not supported by evidence presented at the fact-finding hearing, largely because the trial court

---

[4] The State nonetheless asserts that "Mother does not challenge any of the court's findings as clearly erroneously [sic]." Appellee's Brief at 17. While Mother did not specifically use the phrase "clearly erroneous" to describe findings (d), (f), (g), and (k), she presented a cogent argument that those findings are not supported by the evidence presented at the fact-finding hearing. And the Standard of Review section of Mother's brief accurately defined clear error as occurring when "the record facts do not support the findings[.]" Appellant's Br. at 7 (quoting *In re D.J.*, 68 N.E.3d 574, 578 (Ind. 2017)). Thus, the State is wrong on this point.

merely adopted wholesale the allegations in the CHINS petitions as its findings of fact. And, according to Mother, these findings—which recount statements made to the FCM by Mother and Father R.M.—can only be found in DCS's preliminary inquiry report, which was not admitted at the fact-finding hearing.

[30] We first address Mother's argument that the trial court's practice of copying the CHINS allegations verbatim as its findings was erroneous. To support that position, Mother cites *In re L.T.*, where this Court expressed that a CHINS "adjudication must be based on the evidence presented in court and not on allegations in the pleadings." 145 N.E.3d 864, 871 (Ind. Ct. App. 2020). But neither *L.T.* nor any other authority we have reviewed holds that findings are per se erroneous simply because the court copied allegations from the CHINS petition. If, after all, DCS proved its allegations with substantive evidence, there is no logical reason why the court's recognition of the allegations as true must necessarily fail.[5] Thus, we focus our analysis on whether findings (d), (f), (g), and (k) were supported by evidence presented at the fact-finding hearing.

[31] We agree with Mother that findings (d) and (f) find no support in the record. In finding (d), the trial court found that Mother told the FCM that she smokes marijuana daily and takes suboxone without a prescription. Similarly, in

---

[5] Though perhaps there is something to be said about the fact that when, as here, a trial court simply adopts DCS's allegations as its findings of fact, it weakens our confidence in the court's judgment. Our Supreme Court has recognized as much with respect to a court's wholesale adoption of a party's proposed findings of fact. *See Cook v. Whitsell-Sherman*, 796 N.E.2d 271, 273 n.1 (Ind. 2003) ("This practice weakens our confidence as an appellate court that the findings are the result of considered judgment by the trial court.").

finding (f), the court found that Father R.M. told the FCM that he was aware of Mother's drug use. But DCS presented no evidence at the fact-finding hearing pertaining to statements made by Mother or Father R.M. to the FCM, and DCS specifically declined to call any of Mother's caseworkers to testify. Indeed, the only information presented at the fact-finding about Mother's drug use was that she had marijuana in her possession when she was arrested and had then been charged with possession of marijuana. Mother denied having a drug problem and invoked the Fifth Amendment when asked if she used marijuana or if she could pass a drug test. And no testimony or other evidence was presented regarding Mother's use of suboxone.

[32] For its part, the State concedes Mother's supposed daily marijuana use and use of suboxone find no support in the evidence presented at the fact-finding hearing. But it nonetheless argues the trial court could consider both the CHINS petitions and DCS's preliminary inquiry report as substantive evidence. To support that position, the State draws our attention to the fact that Father R.M. and Father M.G. waived a formal fact-finding:

> Father [R.M.] waived his right to a full trial and submitted the case to the court based on the evidence in the case file, including the preliminary inquiry report[.] Similarly, Father M.G. did not object to the finding that his children, G.G. and A.G.[,] were CHINS when he appeared with counsel[.] While it is true that this Court has observed that the adjudication must be based on the evidence presented in court and not on the allegations in the petition, in this case, Father [R.M.] stipulated that the court could consider the preliminary inquiry report as well as the CHINS petitions.

Appellee's Br. at 18 (internal record citations omitted).

[33] Our Supreme Court has repeatedly rejected arguments like those the State makes here. Most recently, in *In re E.K.*, our Chief Justice explained

> [w]hen a child has two parents and one admits to the allegations but the other denies them, adjudication does not immediately follow. Rather, DCS's allegations may require separate analysis of the facts concerning each parent's conduct. And either parent can challenge whether the court's coercive intervention is necessary. Thus, even when only one parent denies the child is a CHINS, *DCS must still prove its case*.

260 N.E.3d 901, 913 (Ind. 2025) (emphasis added and internal citations omitted). And as the Court reasoned in *K.D.*:

> Situations can exist where an admission by a parent would be incapable of providing a factual basis for the CHINS adjudication. For example, if parents are divorced or separated, one parent could not admit the child is a CHINS based on allegations of what occurred in the other parent's home, unless that parent had first-hand knowledge of what transpired. Such an attempted admission by the parent would likely fall short of being able to establish a factual basis for the event that transpired. Furthermore, allowing this type of admission could lead to vindictive admissions, designed to attack the other parent in cases of parents who are divorced or are going through contentious separations. Speculation is not enough for a CHINS finding. In such scenarios, a contested fact-finding hearing would be necessary to adjudicate the child a CHINS.

962 N.E.2d at 1256 (internal citations omitted).

[34] Of course, no parent here admitted that the Children were CHINS, so this is not *exactly* the kind of case described in *E.K.* and *K.D.* where one parent admitted the allegations while the other denied them. But the fact remains that unlike Mother, Father R.M. and Father M.G. waived a formal fact-finding, and Father R.M. stipulated any information contained in DCS's case file could be used as substantive evidence. Because Mother did not join in that waiver or stipulation, under these circumstances the rule expressed in *E.K.* and *K.D.* applies with equal force so that any evidence stipulated by Father R.M. but which was not presented at the fact-finding hearing could not be used to establish a factual basis for Mother's alleged actions. We acknowledge that *K.D.* suggested in dicta that a parent might be able to admit facts concerning the other if he or she has personal knowledge of them. But we find that given the contentious relationship between Mother and Father R.M., the risk of vindictive admissions cautions strongly against permitting Father R.M.'s evidentiary stipulations or admissions to be used against Mother.

[35] After all, this Court has recognized when one parent's admission is based on the actions of the other parent, "that admission [is] not binding upon [the other parent] or conclusive evidence that [the child] [is], in fact, a CHINS." *In re D.P.*, 72 N.E.3d 976, 982 (Ind. Ct. App. 2017). Indeed, if one parent's admission was automatically sufficient to adjudicate a child as a CHINS, "there would seem to be little point in offering a hearing to the non-admitting parent." *Id.* Because Mother requested a formal fact-finding hearing, DCS was required to prove any allegations against her by presenting evidence at that hearing. *Id.*

("[R]egular rules of procedure apply to [] a fact-finding hearing, including that DCS continues to bear the burden of proving the children are CHINS."). Thus, information in DCS's case file that was not admitted at the hearing could not be used to prove allegations against Mother.

[36] That said, finding (k) contains no facts pertaining to Mother. There, the trial court found that Father M.G. was incarcerated and thus unable to provide necessary care for A.G. and G.G. Because Father M.G. did not contest DCS's allegation that he was incarcerated, the court did not err in recognizing that fact as true even though no evidence of his imprisonment was introduced at the fact-finding hearing.

[37] Moreover, we disagree with Mother's claim that no evidence from the hearing supported finding (g). There, the trial court found that A.M. witnessed the May 6 incident of domestic violence and had been pushed by Father R.M. during that incident. That finding is supported by the testimony of the officer who arrested Mother and the probable cause affidavit DCS introduced into evidence without objection from Mother. The arresting officer testified that Mother told him Father R.M. had "pushed [A.M.] away from the situation." Tr. at 8. The officer explained that A.M. "did see most of what happened[.]" *Id.* at 10. And in the probable cause affidavit, the officer recounted that A.M. told him she saw "daddy push[] mommy" and then drag her out of the house. Ex. at 18. Finding (g) therefore finds clear support in the evidence.

In short, we agree with Mother that findings (d) and (f) were not supported by the evidence but conclude findings (g) and (k) were. And we note reversal is not required simply because two of the trial court's findings were erroneous. *See In re D.P.*, 213 N.E.3d 552, 561 (Ind. Ct. App. 2023) ("Superfluous findings, even if erroneous, cannot provide a basis for reversible error." (quoting *Kanach v. Rogers*, 742 N.E.2d 987, 989 (Ind. Ct. App. 2001))), *trans denied*. Thus, we now turn to Mother's argument that there was insufficient evidence to support the court's remaining findings and judgment.

## 2. Serious Endangerment

Mother next contends that the evidence did "not show that [] Children's physical or mental conditions [were] seriously impaired or seriously endangered[.]" Appellant's Br. at 10. She claims that though she possessed marijuana at the time she was arrested, "[n]o evidence was presented at the fact-finding that [she] used drugs in the presence of the Children or that she was impaired while caring for the Children." *Id.* As to the court's findings about the May 6 incident of domestic violence, she argues A.G. and G.G. did not witness that incident and "[t]here is no evidence of the impact of the alleged violence on the Children, individually or collectively." *Id.* at 11.

Starting with Mother's drug use, we agree that the mere fact Mother possessed marijuana when she was arrested (and presumably used marijuana with some frequency) cannot in and of itself support a CHINS determination. *See In re Ad.M.*, 103 N.E.3d 709, 713-14 (Ind. Ct. App. 2018) ("[E]vidence of one

parent's use of marijuana and evidence that marijuana has been found in the family home, without more, does not demonstrate that a child has been seriously endangered[.]"); *In re S.M.*, 45 N.E.3d 1252, 1256 (Ind. Ct. App. 2015) (reversing a CHINS determination when the mother had a history of marijuana use and admitted to smoking it during her pregnancy, but "[t]here [was] no evidence that the parents [had] ever used drugs in the presence of the children"). And while we decline the State's invitation to consider the fact that Mother tested positive for methamphetamine after the fact-finding hearing, *see supra* note 2, that too would be insufficient without more to show that Mother's drug use endangered the Children, particularly since they were not in Mother's care when she tested positive. *See In re L.P.*, 6 N.E.3d 1019, 1021 (Ind. Ct. App. 2014) (reversing a CHINS determination when "the evidence [] reveal[ed] a single use of methamphetamine, outside the presence of the child"); *Perrine v. Marion Cnty. Off. of Child Servs.*, 866 N.E.2d 269, 277 (Ind. Ct. App. 2007) ("[A] single admitted use of methamphetamine, outside the presence of the child and without more, is insufficient to support a CHINS determination.").

[41] As for the history of domestic violence between Mother and Father R.M., Mother is correct that the trial court's findings focused on the single incident of violence on May 6. But we are mindful that Mother's testimony raised serious concerns for her safety and the mental and physical wellbeing of the Children given Father R.M.'s history of violent behavior. Perhaps that is the most true for A.M. since Mother has continued to take her to visit Father R.M. and because A.M. not only witnessed but was herself involved in the May 6

incident. *See D.P.*, 72 N.E.3d at 984 ("[A] single incident of domestic violence in a child's presence may support a CHINS finding, and it need not necessarily be repetitive.").

[42] While Mother is also correct that A.G. and G.G. did not witness the May 6 incident, the trial court could have reasonably inferred that all three Children had been exposed to domestic violence because Mother dated Father R.M. for several years and sometimes took A.G. to his house even after breaking up with him. *See L.T.*, 145 N.E.3d at 872 (explaining that mere exposure to domestic violence can endanger a child's mental health, even if their physical health is not threatened). The record shows that the court inferred that all three Children had been traumatized by their exposure to domestic violence between Mother and Father R.M., and that inference is supported by the evidence and is implicit in the court's findings. Indeed, the court noted from the bench—and Mother agreed—that Children had all "been through a lot" and "need[ed] help with that[.]" Tr. at 31.

[43] We also note that the trial court's findings are silent as to Mother's housing instability, and so we look at the evidence as a whole to determine whether that factor supports the court's CHINS determination. *See In re N.E.*, 228 N.E.3d 457, 477 (Ind. Ct. App. 2024) (reasoning that parents' "lack of housing [] raises a significant concern regarding their capacity to meet [their child's] needs"). Mother testified that she did not have stable housing and spent many nights sleeping on friends' couches. She also told the court that she wanted help obtaining housing. The court's conclusion that Mother could not meet the

Children's needs was not erroneous since Mother did not have a stable home for Children to go to should they have been returned to her care.

[44] In sum, the evidence presented at the fact-finding hearing and the trial court's findings thereon were sufficient to establish a history of domestic violence between Mother and Father R.M., that the Children had each been exposed to that violence and suffered trauma as a result, and that Mother needed help to maintain stable housing. Thus, the court did not clearly err in concluding the Children's physical and mental conditions had been seriously impaired or endangered.

### 3. Coercive Intervention

[45] Finally, Mother alleges the trial court erred in its determination that the Children's needs would not be met without the coercive intervention of the court. We disagree. When determining whether coercive intervention is necessary, we determine "whether the parents must be coerced into providing or accepting necessary treatment for their child." *In re E.K.*, 83 N.E.3d 1256, 1262 (Ind. Ct. App. 2017), *trans. denied*. Here, Mother's refusal to participate in services during the pendency of these proceedings demonstrates she would not have obtained the help the Children needed without the court's coercive intervention. *See N.E.*, 228 N.E.3d at 477 (affirming a CHINS determination when parents refused to participate in services, denied they required services, and testified during the fact-finding hearing that they would not participate unless ordered to do so).

Indeed, Mother testified that she had refused to meet with her case manager because she had not been "court-ordered" to do so. Tr. at 24. Though Mother denied she would only engage with services if compelled by a court order, the trial court was permitted to discredit Mother's testimony in light of the fact that she had refused to voluntarily engage in services after her release from jail. In fact, when describing why she had refused to participate, Mother simply said, "[W]e don't need services." *Id.* at 22. Mother's denial that she and her Children need services, coupled with her refusal to participate in those services, were sufficient to support the trial court's conclusion that the Children's needs were unlikely to be met without the court's coercive intervention.

## Conclusion.

For these reasons, we affirm the trial court's CHINS determinations.

Affirmed.


Brown, J., and Altice, J., concur.


ATTORNEY FOR APPELLANT

Katherine N. Worman
Worman Legal
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

David E. Corey
Supervising Deputy Attorney General
Indianapolis, Indiana